# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Kimberly Davis, individually and as the representative of a class of similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>Stadion Money Management, LLC, and United of Omaha Life Insurance Company,<br><br>Defendants. | No. 19-CV-119<br><br><br>**CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.      Plaintiff Kimberly Davis ("Plaintiff"), individually and as the representative of the Class described herein, brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants Stadion Money Management, LLC ("Stadion") and United of Omaha Life Insurance Company ("United of Omaha"). As described herein, Defendants have breached their fiduciary duties and engaged in other unlawful conduct to the detriment of Plaintiff and the Class. Plaintiff brings this action to recover losses caused by this unlawful conduct, prevent further similar conduct, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      Stadion provides a managed account service to participants in employer-sponsored retirement plans governed by ERISA. Through the service, participants pay

1

Stadion a fee, and in return, Stadion accepts complete fiduciary discretion to manage the participant's retirement account by allocating the participant's account balance among the investment options offered within the plan.

3.  Stadion is not a well-known investment manager. Although Stadion has over $3 billion in assets under management within its managed account service, this is based not on the strength of its investment management acumen, but on its relationships with insurance companies who market group annuity products to small and midsize retirement plans. This case focuses on Stadion's relationship with United of Omaha, and the self-interested conduct of both parties in relation to Class members' retirement assets.

4.  Stadion depends on United of Omaha as its entrée to employers. United of Omaha sells employers a group annuity product that serves as a one-stop-shop for employees' retirement savings. Employees receive account statements, investment information, and a menu of investment options, and United of Omaha receives fees. United of Omaha also pitches Stadion's managed accounts as an add-on service. If employers include Stadion's service, Stadion exercises complete discretion over participating employees' accounts by selecting investments from the menu of options in the employer's retirement plan. Stadion receives a fee from participating employees, which it shares with United of Omaha and its affiliates.

5.  It is not unusual for a managed account provider to depend on another provider to pitch their service to employers. Nor is it unusual for the managed account fee to be split between them. There is potential for abuse, however, if a managed account provider can confer additional benefits on its marketing partner or itself by selecting certain

2

investment options over others for participants. Unfortunately, that is what happened here, and Defendants violated ERISA by putting their own interests ahead of retirement plan participants.

6. Stadion owed fiduciary duties under ERISA to every participant enrolled in its service. These duties are "the highest known to the law." *Tatum v. RJR Pension Inv. Cmmtee*, 761 F.3d 346, 358 (4th Cir. 2014). Stadion was required to act solely in the interest of participants and beneficiaries, and "exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000). Stadion also was required to manage participants' accounts with the care, skill, prudence, and diligence of a prudent person in similar circumstances. 29 U.S.C. § 1104(a)(1)(B). For its part, United of Omaha could not knowingly benefit from Stadion's violations of ERISA in connection with the managed account program. *See Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

7. Stadion breached its fiduciary duties by making investment decisions to further its own interests and the interests of United of Omaha. Stadion directed participants' accounts into United of Omaha- and Stadion-affiliated investment options, despite the availability of lower-cost, higher-performing investment options within the plan that would have better met the needs of participants. In certain cases, there were *identical* options available in the plan menu that would have charged 50% less in fees. Stadion avoided these options because they did not generate as much revenue for its business partner, United of Omaha. In other cases, Stadion financially benefited itself and United of Omaha by

continuing to use Stadion-affiliated accounts despite their underperformance on both an absolute and risk-adjusted basis.

8.     United of Omaha improperly retained revenue resulting from Stadion's malfeasance despite knowledge of Stadion's compromised loyalty and imprudence. Indeed, United of Omaha expected preferential treatment from Stadion in exchange for retaining Stadion as a managed account provider available through its retirement platform.

9.     Based on this conduct, Defendants cost participants millions of dollars in losses due to excess fees and investment underperformance. To remedy this, Plaintiff asserts ERISA claims against Stadion for breach of the fiduciary duties of loyalty and prudence (Count I) and prohibited transactions (Counts III & IV), and against United of Omaha for knowingly profiting from a fiduciary breach (Count II).

## JURISDICTION AND VENUE

10.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide, among other things, that participants in an employer-sponsored retirement plan may pursue a civil action to redress violations of ERISA, recover losses resulting from a fiduciary breach, restore profits made by fiduciary self-dealing, and obtain appropriate equitable relief, as set forth in 29 U.S.C. §§ 1109 and 1132.

11.     This case presents a federal questions under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

12.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because Plaintiff resided in this district when she received Stadion's managed account services through her employer's retirement plan.

4

# THE PARTIES

## PLAINTIFFS

13.     Plaintiff has resided in Greensboro, North Carolina since 2008. Plaintiff worked for Palace Entertainment in Greensboro, North Carolina and Riverhead, New York, and participated in its 401(k) retirement plan (the "Palace Plan"). The Palace Plan offered investments through a United of Omaha group variable annuity contract, and also included Stadion's managed account service. Plaintiff Davis was a participant in Stadion's managed account service until March 2013, at which time Davis received a distribution of the benefits in her account from the Palace Plan, and Stadion canceled her service. Plaintiff's account would have been worth more at the time it was distributed if not for Defendants' violations of ERISA.

## DEFENDANTS

14.     Stadion is a registered investment adviser based in Watkinsville, Georgia. Stadion started business in 1993 as Personal Mutual Fund Management Inc., and has also operated under service marks "401k Toolbox" and "Manage it for Me". Stadion provides its managed account services to participants in ERISA-covered plans throughout the United States, including North Carolina.

15.     United of Omaha is an insurance company first organized in Nebraska in 1926 and based in Omaha, Nebraska. United of Omaha issues group variable annuity contracts to employer-sponsored retirement plans and provides attendant administrative and investment services. United of Omaha services numerous retirement plans in North Carolina, and manages investments of numerous participants located in North Carolina.

5

# BACKGROUND

## SMALL RETIREMENT PLAN MARKETPLACE AND MANAGED ACCOUNT SERVICES

16.     United of Omaha serves the "small" retirement plan market. Most plans that include Stadion's managed account service through United of Omaha have fewer than 100 participants with account balances.

17.     Insurance companies like United of Omaha have the largest share of the market for services to small plans. Insurance companies and their agents typically market group variable annuity contracts to small plans, with an array (typically 15-60) of annuity "subaccounts" (see *infra*, ¶ 29) as investment options for participants.

18.     Insurance companies sell group variable annuities as a comprehensive solution to a smaller company's retirement plan needs. In addition to the underlying investments, these products often include services such as recordkeeping, custodial services, annual reporting, discrimination testing, preparation of required performance and fee disclosures, employee enrollment and education, and a secure website for employee account management.

19.     In light of the comprehensive nature of these products, employers sponsoring small retirement plans typically do not independently investigate additional services to supplement those provided by the insurance company. As a result, companies wishing to deliver additional services to the small retirement plan market typically must do so through a marketing agreement with one or more of the providers servicing this market.

6

20.     This has indeed been the case with managed account services. In basic form, a managed account provider operates as a "3(38)" fiduciary under ERISA. The managed account provider has complete discretion to manage and dispose of the assets in the participant's account by selecting which of the plan's options to invest in, the amount of existing assets to invest in each option, and the investments to which future contributions are directed.

21.     Industry executives have acknowledged that a small plan's choice of a managed account provider is "driven" by existing service providers. *See Advisory Council Report of the Working Group on Optional Professional Management in Defined Contribution Plans* (Nov. 7, 2003)*, available at* https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2003-optional-professional-management-in-defined-contribution-plans (last visited January 24, 2019). Based on this and other research, a Department of Labor advisory group found that small plans have "limited ability … to independently assess and monitor the qualifications and performance" of managed account providers. *See id.*

22.     The influence a small plan's primary service provider has in the selection and retention of a managed account provider creates risk of confused loyalties for the managed account provider. A managed account provider must act solely in the interest of participants, see *supra*, ¶ 6, but its marketing partners control whether its services will be offered.

## STADION'S MANAGED ACCOUNT SERVICE

23. During its first ten years, Stadion accumulated approximately $445 million in assets under management. Over its next ten years, by 2013, Stadion grew to over $5 billion. The primary source of Stadion's accelerated growth was its managed account service for small retirement plans.

24. Stadion's managed account service did not grow as a result of its strong brand name or performance record. Indeed, during this period of rapid growth, Stadion changed its name, canceled its longtime service marks, and delivered underwhelming results. Independent third-party plan consultants have almost universally rejected Stadion-managed investments for their clients.

25. Instead, like other managed account providers in the small plan market, see *supra*, ¶ 21, Stadion depended on its relationships with other service providers. Stadion established new marking relationships with insurance companies and their affiliates to pitch Stadion's managed account service in connection with their group variable annuity platforms. One of those insurance companies was United of Omaha.

26. Stadion splits its managed account fee with insurance companies and their affiliates, including United of Omaha and its affiliates. This fee is incurred by plan participants, and is paid on top of the fees that are charged within the underlying investment options.

27. Once Stadion's services commence, Stadion has complete discretion over participating employees' accounts. Stadion determines which of the plan's investment options to invest in, the amount of existing assets to invest in each option, and the

investments to which future contributions are directed. This presents a potential conflict of interest where the investments being selected are offered by Stadion or its marketing partner.

28.     Stadion allows employers to offer its service to employees on an opt-in or opt-out basis. This choice does not affect Stadion's investment strategy. Stadion manages a participant's account the same way, regardless of whether an account is an opt-in or opt-out account.

### UNITED OF OMAHA'S GROUP VARIABLE ANNUITY INVESTMENT OPTIONS

29.     United of Omaha maintains a list of investment options available through its group variable annuity contracts. These investment options are called "subaccounts". Generally, each subaccount is a pooled investment vehicle managed at the direction of an investment manager. A subaccount's investment strategy may call for investment in a particular asset class (e.g., stocks, bonds), sub-asset class (e.g., small cap stocks, large cap stocks), style (e.g., growth, value), or a mix of asset classes and styles. Further, the subaccount manager can execute this strategy either by investing directly in stocks and bonds, or by investing in other pooled investment vehicles—such as mutual funds, collective investment trusts, or exchange-traded funds—that themselves purchase securities in order to execute a particular investment strategy.

30.     Each subaccount (other than the Guaranteed Account, see *infra*, ¶ 32) charges fees as a percentage of the net asset value of the subaccount. This is called the "expense ratio". The expense ratio reduces the investment return received by participants. The expense ratio is separate from, and in addition to, the managed account fee.

9

31.     Each subaccount's expense ratio has two parts, the management fee and the product charge. The management fee includes the investment manager's fee and any fees charged by underlying investments selected by the investment manager. The product charge is paid to United of Omaha for administrative services in connection with the subaccount. Expense ratios and their parts may vary between subaccounts, but not between plans.[1]

32.     The Guaranteed Account is a special interest-bearing subaccount managed by United of Omaha. There is no explicit expense ratio for this subaccount. Instead, United of Omaha retains investment earnings that exceed the interest credited to participants. United of Omaha refers to its retained earnings as "implicit fees". These fees are separate from, and in addition to, the managed account fee.

33.     There are several subaccounts that are available in every United of Omaha-administered plan that includes Stadion's managed account service. The first category is index funds that track a market index associated with a particular asset class.  Each such plan offers a large cap, mid cap, small cap, international, and bond index fund subaccount. The second type of subaccount is the Guaranteed Account. The third and final category is a set of asset allocation subaccounts for which Stadion serves as the investment manager.

---

[1] For illustration purposes, Subaccount A may have a management fee of 0.10% and a product charge of 0.25%. Subaccount B may have a management fee of 0.50% and a product charge of 0.50%. Participants in Plan 1 pay 0.35% of their account value held in Subaccount A, and 1.00% of their account value held in Subaccount B. So do participants in Plan 2.

## STADION'S APPROACH TO MANAGED ACCOUNTS IN UNITED OF OMAHA PLANS

34.     Stadion manages thousands of participant accounts in United of Omaha-administered plans through its managed account program. On behalf of each participant, Stadion has complete discretion to select between available subaccounts, to decide how much of their account will be invested in each subaccount, and to change between subaccounts.

35.     Stadion does not create a custom portfolio for each individual participant. Instead, each participant is assigned to one of six risk-based portfolios: Capital Preservation, Conservative, Balanced, Moderate Growth, Growth, and Maximum Growth. Risk assignments may be based on a participant's age or responses to a questionnaire. Stadion invests each portfolio the same way for all participants assigned to that portfolio.

36.     Stadion uses a core/flex approach to manage each portfolio.  Part of each portfolio remains invested in equity securities at all times, and part of each portfolio remains invested in fixed income securities at all times. This is the core part, and Stadion puts money in several different subaccounts, including its own, to execute the core portion of the strategy. The remainder of each portfolio is devoted to Stadion's asset allocation strategy. This is the flex part. Stadion adjusts the asset allocation of the flex portion based on its assessment of market conditions. Stadion exclusively used its own subaccounts to execute the flex portion of each portfolio. The proportion of each portfolio allocated to core equity or core fixed income, or reserved for flex, is based on the risk objective of the portfolio, as illustrated by the chart below:

11



## DEFENDANTS' VIOLATIONS OF ERISA

### STADION'S SELECTION AND RETENTION OF COSTLY, UNDERPERFORMING INVESTMENTS TO BENEFIT ITSELF AND UNITED OF OMAHA

37. In selecting subaccounts to implement each portfolio's investment strategy, Stadion was acting in a fiduciary capacity. Stadion was bound by the twin fiduciary duties of loyalty and prudence outlined in 29 U.S.C. § 1104(a). These duties are "the highest known to the law." *Tatum*, 761 F.3d 346, 358 (4th Cir. 2014).

38. "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display ... complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).

12

39.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citation and internal quotation marks omitted). Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation and internal quotation marks omitted).

40.    Fiduciaries may be held liable for assembling an imprudent investment portfolio or for failing to monitor those investments to ensure that each option remains prudent. *See Tatum*, 761 F.3d at 358; *Sims v. BB&T Corp.*, 2018 WL 3128996, at *5, 7–8 (M.D.N.C. June 26, 2018).

41.    "Congress intended ERISA's fiduciary responsibility provisions codify the common law of trusts." *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001). Pursuant to trust law's prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also id.* § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function . . . ."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market-efficiency concepts and differences in the degrees of efficiency and

13

inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled-investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

*Id.*, ch. 17, intro. note (2007). ERISA's requirement that fiduciaries "defray[] reasonable expenses of administering the plan" embraces this common law duty to limit costs. 29 U.S.C. § 1104(a)(1)(A)(ii).

42. Stadion breached its fiduciary duties and violated other provisions of ERISA (see *infra*, Counts I, III & IV) in several respects.

### Stadion's Investment of the Core Equity Portion of Managed Accounts

43. As illustrated above (see *supra*, ¶ 36), Stadion's approach to managed accounts calls for between 5% and 65% of each participant's account to remain invested in a core equity position (i.e., stocks).

44. To accomplish this, Stadion has allocated the core equity portion of each participant's portfolio to the Stadion-managed asset allocation subaccounts available in each plan. Through these subaccounts, Stadion has purchased and retained exchange-traded funds that track major stock market indexes.

45. Stadion's use of its own subaccounts to invest the core equity portion of each managed account added extra costs for participants. The extra fees were paid to United of Omaha, but conferred no benefit on participants. Stadion could have instead allocated the

14

core equity portion of participants' accounts into the index fund subaccounts available in each plan, which would have provided access to the exact same underlying securities at significantly lower cost to participants. But Stadion either did not investigate the cost differences between subaccounts, or chose the higher cost strategy to benefit its marketing partner, United of Omaha.

46.     To illustrate, approximately half of the core equity assets held in Stadion subaccounts are invested in S&P 500 index funds. S&P 500 index funds seeks to replicate the performance of the Standard & Poor's 500 Index by investing in the underlying equity securities that make up that index.

47.     Assets invested in this manner are subject to the product charge for Stadion-managed subaccounts (paid to United of Omaha, see *supra*, ¶ 31) and an underlying fund charge (paid to the manager of the underlying S&P 500 fund, see *id.*). Yet Stadion could have invested in the same underlying securities by investing directly in the plan's S&P 500 index fund subaccount that was available in every one of the United of Omaha plans at issue. *See supra*, ¶ 33. The underlying fund charge in this subaccount was materially similar to the underlying fund charge in the Stadion-managed subaccounts, but the product charge paid to United of Omaha was about 50% less (United of Omaha charges higher product charges in Stadion-affiliated subaccounts than any other subaccount within these plans).

48.     Participants would have earned approximately 0.30% higher net returns on S&P 500 investments in the core equity portion of their portfolios if Stadion had used the S&P 500 index fund subaccount instead of the Stadion-managed asset allocation subaccounts. Put another way, United of Omaha received approximately 0.30% more from

15

S&P 500 investments in the core equity portion of participant accounts as a result of Stadion's choice of subaccounts, all at the expense of participants.

49.     Stadion also benefits from allocating monies to the Stadion-affiliated subaccounts.  These allocations boost Stadion's reportable assets under management, improving its attractiveness within the marketplace. The higher level of Stadion's core equity investments allowed it to enter into a joint marketing venture with the investment manager of the exchange-traded funds that Stadion used to invest the core equity assets in its subaccount. And the higher assets under management lowered Stadion's trading costs, benefiting Stadion's other customers and thus Stadion's standing in the marketplace.

50.     The same imprudent conduct described above relating to the S&P 500 index fund investment occurred for core equity investments other than the S&P 500. Stadion invested in other stock market indexes through Stadion-managed asset allocation subaccounts, despite having access to other index fund subaccounts that invested in the same underlying securities at lower cost to participants (i.e., with a lower product charge paid to United of Omaha).

51.     The costlier route afforded no advantage to participants. The only difference was that index funds used in Stadion-managed subaccounts are exchanged-traded funds, which are valued and trade intraday, whereas the index funds used in other subaccounts are valued once per day and may only be bought and sold as of market close. Although intraday trading could be beneficial within the flex portion of Stadion's managed accounts, this possible benefit does not apply to the core equity portion. Stadion's core equity strategy is a buy-and-hold strategy, so being able to move rapidly in and out of markets based on

16

intraday valuations was not a benefit. A prudent and loyal fiduciary implementing the core equity strategy would have used the lower-cost index fund subaccounts and would have avoided the higher product charges that resulted from investing in index funds through Stadion's asset allocation subaccounts.

### *Stadion's Investment of the Core Fixed Income Portion of Managed Accounts*

52.     As illustrated above (see *supra*, ¶ 36), Stadion's approach to managed accounts calls for between 10% and 55% percent of each participant's account to remain invested in a core fixed income position.

53.     To accomplish this, Stadion used United of Omaha's Guaranteed Account. The Guaranteed Account guarantees principal amounts invested and provides a stated rate of return. The stated rate attaches to monies at the time of deposit and is adjusted periodically by United of Omaha.

54.     In order to pay returns and generate its own compensation, United of Omaha takes the monies deposited in the Guaranteed Account, transfers them to its general account, and invests the monies in a portfolio of fixed income investments, i.e. bonds. If these investments produce income that is higher than the stated returns, that difference is retained by United of Omaha.

55.     United of Omaha generally sets the stated return rate at a level that is 1.00% to 2.00% lower than the income it expects to earn by investing the underlying assets. United of Omaha's profits on fixed income investments has fluctuated year-to-year, but has generally conformed to this anticipated 1.00% to 2.00% spread. United of Omaha refers to its spread as "implicit fees" of the Guaranteed Account.

17

56. The Guaranteed Account was not a prudent investment option given its unattractive risk-reward profile. There are many principal-guaranteed fixed income investments available to retirement plans, and the proliferation of these products have created a marketplace of insurance companies willing to guarantee a fixed income portfolio against loss of principal for an annual fee. For the past decade, this fee has averaged between 0.08% and 0.30% of assets being guaranteed, with current rates between 0.18% and 0.22% per year. T. Rowe Price, *Stable Value: An Increasingly Attractive Principal Preservation Alternative*, June 2017, at 3, *available at* https://www3.troweprice.com/usrps/content/dam/b2bdx/secure/Investments/Stable_Value _Price_Perspective_GL_P6_FINAL.pdf (last visited Jan. 24, 2019). Yet United of Omaha was charging participants ***five to ten times*** this amount within the Guaranteed Account, resulting in net returns of roughly 0.94% per year over the past five years, less than half the average annual returns earned during the same period by principal-guaranteed peers of the Guaranteed Account, as measured by the Hueler Index. The small reduction in risk offered by the Guaranteed Account was not justified by the massive, inflated cost United of Omaha charged for it; a prudent, objective fiduciary therefore would not have invested the core fixed income portion of participants' accounts in the Guaranteed Account.

57. Stadion's options for core fixed income investments included subaccounts that invest in fixed income securities similar to the securities that United of Omaha purchases for its own benefit using the monies invested in the Guaranteed Account. For example, United of Omaha-administered plans generally offer a bond index fund and an actively-managed diversified bond fund. These are low risk investments with successful

18

long-term track records. Returns on these investments have exceeded those of the Guaranteed Account by over 1.00% per year (net of fees) during the relevant period.

58.     These other options generated more than double the returns as a result of lower fees. Although the underlying assets are similar and produced similar gross returns, the other options cost less than the Guaranteed Account's "implicit fees". In essence, participants paid United of Omaha five to ten times more for a principal guarantee than that guarantee was worth, unnecessarily slashing their returns in half even though the covered fixed income investments were already low-risk, and similar investments were readily available in each plan without that added cost.

59.     While Stadion's choice of the United of Omaha Guaranteed Account over other fixed income options was not justified on the merits, Stadion's distribution relationship with United of Omaha provides a plausible explanation for why that choice was made. United of Omaha and its affiliates issue an agreement to employers that allows them to add Stadion's service to their plan. This agreement requires employers make the United of Omaha Guaranteed Account available as an investment option in their plan "[i]n order for the Stadion services to be offered".

60.     Although Stadion has complete discretion to determine which options to invest in on behalf of managed account participants, the terms of this agreement imply that United of Omaha *expects* Stadion to invest managed account assets in the Guaranteed Account, and would not have offered Stadion's services to plan sponsors absent an understanding that Stadion would allocate monies to the Guaranteed Account. This benefits United of Omaha and Stadion, as United of Omaha receives a steady flow of assets to

19

generate "implicit fees" for itself, and Stadion maintains security with its marketing partner. However, it is not in the best interest of plan participants. Stadion has breached, and continues to breach, its fiduciary duties by investing managed account assets to secure favor with United of Omaha. A prudent, impartial fiduciary would have evaluated the fixed income options from the point of view of participants and selected alternatives to the Guaranteed Account that would have netted significantly higher returns without paying for a principal guarantee that was worth five to ten times less than United of Omaha was implicitly charging for it.

### Stadion's Investment of the Flex Portion of Managed Accounts

61.    As illustrated above (see *supra*, ¶ 36), Stadion's approach to managed accounts calls for between 25% and 40% percent of each participant's account to be remain flexible, without maintaining long-term positions in a specific asset class.

62.    To accomplish this, Stadion has used the Stadion-managed asset allocation subaccounts available in each plan. Through these subaccounts, Stadion has purchased and retained funds that track various market indexes. Stadion purports to evaluate market signals and move flex assets between funds to attempt to enhance investment returns.

63.    Retaining these subaccounts was not in the best interest of participants. Stadion-managed subaccounts with at least five years of performance history have underperformed their stated benchmark indices by approximately 0.50% to 2.00% per year since their inception. Moreover, Stadion's subaccounts have consistently exhibited significantly negative levels of alpha, which means that the subaccounts' risk-adjusted performance was well below that of their benchmark indexes, further illustrating that

Stadion's models and managers have demonstrated no discernable skill in strategically moving assets between markets to attempt to capitalize on market conditions.

64.     To make matters worse, Stadion's subaccounts have high product charges relative to other subaccounts (see *supra*, ¶¶ 47, 50–51). However, Stadion has no incentive to move managed account investments to other subaccounts with lower product charges, because this would reduce United of Omaha's revenue, threaten Stadion's ongoing marketing relationship with United of Omaha, and eliminate the indirect financial benefits Stadion accrued from the use of Stadion-affiliated subaccounts. *See supra*, ¶ 49.

65.     The imprudence of Stadion-managed investments is underscored by the behavior of unaffiliated fiduciaries. Stadion's investment products do not appear to have achieved any traction outside of plans administered by companies with whom Stadion has a marketing relationship. Based on a review of Form 5500 filings, it does not appear that any defined contribution plans not administered by a marketing partner of Stadion have included Stadion-managed investments in their investment menu. Further, within plans that have included Stadion-affiliated options, the Stadion-affiliated options are used almost exclusively by participants whose accounts are being managed by Stadion. Participants controlling their own investment decisions have by and large avoided the Stadion investments.

66.     Red flags have also been raised by independent analysts. Morningstar, a third-party provider of data and analysis regarding pooled investment vehicles, observed in late 2017:

Of particular concern is [Stadion's] launch-and-liquidate history. Since 2003, the firm has launched eight funds under its banner. While one was merged away after 14 years, Stadion hasn't been as patient with others: Three were liquidated within two to five years and one overhauled its approach in less than three years…. [T]hat's a poor track record of product development, and fund investors in aggregate have experienced subpar performance overall.

Leo Acheson, Morningstar Analyst Report of Stadion Tactical Growth Fund, December 29, 2017.

67.     Morningstar also has noted other disturbing trends. "With a private-equity partner since 2011, the firm seems to be emphasizing growth and profitability. Its sales team is about three times larger than its investment team. Portfolio manager bonuses are driven by firm profitability. … [F]und performance doesn't explicitly factor into compensation—a rare practice among well-regarded stewards. Portfolio managers have not invested meaningfully alongside fundholders." *Id.*

68.     Given Stadion's poor track record of risk-adjusted performance, the high product charges associated with its managed accounts, and other red flags, a prudent and loyal fiduciary would have replaced the Stadion-managed subaccounts. Stadion could have used the flex position in its managed account strategy to invest in other subaccounts managed by unaffiliated investment managers. There were numerous options available with strong absolute and risk-adjusted long-term track records, which could have further diversified participants' portfolios beyond core equity and core fixed income positions. Yet it does not appear that Stadion considered other options, as Stadion demonstrated an unyielding preference for its own subaccounts, despite their inferiority.

69.     For its part, United of Omaha received significant additional revenue as a result of Stadion's breaches of its fiduciary duties and other violations of ERISA. These monies were transferred from participant accounts held in United of Omaha's client plans to United of Omaha at Stadion's direction.

70.     United of Omaha had knowledge of facts demonstrating that Stadion's direction of plan assets violated ERISA. Indeed, United of Omaha was complicit in compromising Stadion's loyalty. United of Omaha agents used a form agreement that required employers to offer United of Omaha's Guaranteed Account to participants in order to offer Stadion's managed account service within their plan (see *supra*, ¶ 59). This implies an understanding between United of Omaha and Stadion that Stadion would direct managed account assets to United of Omaha's Guaranteed Account instead of other fixed income options, allowing United of Omaha to invest those monies and earn spread. Although Stadion had ultimate fiduciary discretion to determine whether to continue to direct managed account assets to the Guaranteed Account, United of Omaha's knowledge that Stadion exercised preference for its Guaranteed Account over other options rendered its receipt of revenue in result of Stadion's breach improper (and illustrated that Stadion was conflicted generally).

71.     United of Omaha also had sufficient knowledge of Stadion's imprudence and disloyalty in regard to Stadion-managed subaccounts to render its receipt of higher product charges in connection with those subaccounts improper. United of Omaha was aware that sometimes identical investments with lower product charges were available to Stadion

23

through other subaccounts. Likewise, United of Omaha was aware of Stadion's dependence on United of Omaha and its desire to maintain favor with its host. In addition, United of Omaha was aware of Stadion's performance deficiencies relative to other subaccounts available to its client plans. Under these circumstances, United of Omaha knew that Stadion's direction of managed account assets to Stadion-managed subaccounts was an ongoing breach of Stadion's fiduciary duties.

72. Based on United of Omaha's knowledge of Stadion's violations of ERISA, United of Omaha is liable to disgorge all managed account assets transferred to it.

## PLAINTIFF'S LACK OF KNOWLEDGE OF DEFENDANTS' ERISA VIOLATIONS

73. Plaintiff did not have knowledge of all material facts (including but not limited to Stadion's self-serving marketing arrangement with United of Omaha, Stadion's lack of historical success as an investment manager, Stadion's subversion of participants' interests to its own interests and United of Omaha's interests; the specific flaws in Stadion's managed account service; the manner in which other managed account services from other providers prudently operated and administered; the structure of United of Omaha's Guaranteed Account relative to other investment options in the plan, and other facts) necessary to understand that Stadion breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until recently, shortly before this action was filed. Further, Plaintiff does not have actual knowledge of the specifics of Defendants' decision-making processes with respect to managed accounts, including Stadion's processes for designing its investment strategies, its processes for selecting, monitoring, and removing specific investments, and whether these processes provided preferential

24

treatment to particular investments that were more profitable to United of Omaha and/or Stadion, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this action as a class action pursuant to Rules 23(a), 23(b)(1), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated persons (the "Class"):[2]

> All participants and beneficiaries whose accounts were enrolled in Stadion's managed account service within a retirement plan administered by United of Omaha for any period of time after January 25, 2013.

75.    Numerosity: The Class is so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time, Plaintiff believes that there are thousands of Class members.

76.    Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was enrolled in Stadion's managed account service through a retirement plan administered by United of Omaha, and has suffered injuries as a result.

77.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that she seeks to represent, and she has retained counsel experienced in complex class action litigation. Plaintiff does not have

---

[2] Plaintiff reserves the right to propose other or additional classes or subclasses in her motion for class certification or subsequent pleadings in this action.

any conflicts of interest with any Class members that would impair or impede her ability to represent such Class members.

78. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

   a. Whether Stadion owed fiduciary duties to participants and beneficiaries enrolled in its managed account service;

   b. Whether Stadion breached its fiduciary duties by directing participant assets into United of Omaha's Guaranteed Account for the core fixed income portion of participant portfolios;

   c. Whether Stadion breached its fiduciary duties by directing the core equity portion of participants' assets into Stadion-affiliated subaccounts;

   d. Whether Stadion breached its fiduciary duties by allocating assets to Stadion-affiliated accounts to implement the flex part of its managed account strategy;

   e. Whether the selection of investments that paid fees to United of Omaha, and the investment of participants' assets in United of Omaha's Guaranteed Account, constituted prohibited transactions;

   f. Whether the financial benefits received by Stadion through its investment of participant assets in Stadion-affiliated investments constituted prohibited transactions;

   g. Whether fees and profits received by United of Omaha in connection with Stadion's managed account service and related investments are subject to disgorgement under the circumstances described in this Complaint;

   h. The proper form of equitable and injunctive relief; and

   i. The proper form of monetary relief.

79. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable or injunctive relief by the Court will affect the interests of all Class members.

80. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The conduct described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial

27

efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)-(B)**

81.     As alleged above, Stadion owes fiduciary duties to participants in its managed accounts service pursuant to 29 U.S.C. §§ 1002(21)(A)(i) and 1002(38)(C).

82.     ERISA imposes strict fiduciary duties of prudence and loyalty upon Stadion in its administration of managed accounts and in the selection and monitoring of investments. *See* 29 U.S.C. § 1104.

83.     As described above, Stadion engaged in imprudent and disloyal conduct with respect to its managed account service, including the imprudent and disloyal allocation of Class members' retirement account assets into United of Omaha- and Stadion-affiliated investment options that resulted in higher fees and worse investment performance than unaffiliated options that would have provided better performance at lower cost. Stadion acted in its own business interests and the business interests of United of Omaha instead of the interests of plan participants. In managing Class members' retirement accounts, Stadion sought to (and did) enrich United of Omaha in order to preserve of Stadion's marketing partnership with United of Omaha, to the detriment of such Class members.

84.     As a consequence of Stadion's breaches of fiduciary duty, Class members suffered millions of dollars in losses due to excessive fees and investment underperformance. Stadion is liable to make good to such Class members all losses

28

suffered as a result of Stadion's fiduciary breaches, and to disgorge all profits resulting from its unlawful conduct, in addition to further equitable and injunctive relief.

**COUNT II**
**Knowingly Profiting from a Fiduciary Breach**
**29 U.S.C. § 1132(a)(3)**

85.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. The Supreme Court held in *Harris Trust*, see *supra*, ¶ 6, that a defendant may be liable under this section regardless of whether it is a fiduciary. In particular, a non-fiduciary party in interest who has received ill-gotten profits resulting from a violation of ERISA is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transactions or payments unlawful.

86.    As described throughout the Complaint, United of Omaha earned profits from Stadion's imprudent and disloyal allocation of participant assets to United of Omaha's Guaranteed Account. United of Omaha also earned higher profits as a result of Stadion's allocation of assets to Stadion-managed subaccounts than United of Omaha would have earned had Stadion allocated those monies to other investment options. All payments to United of Omaha made in connection with Stadion's managed accounts, or the proceeds of such payments, are determinable and traceable through the records kept by United of Omaha.

87.    United of Omaha had actual and constructive knowledge of the circumstances rendering Stadion's allocation of assets to the United of Omaha- and Stadion-affiliated investments unlawful. As administrator of these plans, United of Omaha

had actual or constructive knowledge of the fees charged by Stadion's subaccounts compared to the fees charged by other investment options offered within United of Omaha-administered plans, and of the profits it was earning from monies invested in the Guaranteed Account compared with the fees charged by other fixed income investments offered to participants in United of Omaha-administered plans. United of Omaha also had actual or constructive knowledge of Stadion's improper preference for the Guaranteed Account over other fixed income options due to its business agreement with Stadion, and also had knowledge of Stadion's conflicts of interest more generally. Accordingly, Plaintiff and the Class are entitled to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including to disgorgement of all profits earned by United of Omaha as a result of Stadion's fiduciary breaches and prohibited transactions during the class period, under principles of unjust enrichment and equitable restitution.

## COUNT III
### Prohibited Transactions with a Party in Interest
### 29 U.S.C. § 1106(a)(1)

88.     As alleged throughout this Complaint, Stadion is a fiduciary with respect to the assets that it manages for participants enrolled in Stadion's managed account program through plans administered by United of Omaha.

89.     As a provider of administrative and investment platform services to the same plans, United of Omaha is a party in interest with respect to such plans under 29 U.S.C. § 1002(14)(B).

90.     As described throughout the Complaint, Stadion caused plans to engage in transactions with United of Omaha by (1) investing participant assets in United of Omaha's

30

Guaranteed Account; and (2) investing participant assets in other accounts that paid higher product charges to United of Omaha than other available investment options.

91.     These transactions constituted a direct or indirect furnishing of services between the plans and a party in interest, a direct or indirect transfer of assets of the plan to a party in interest, a transfer of assets of the plan for use by a party in interest, and a transfer of the assets of a plan for the benefit of a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C), (D).  Stadion caused the plan to engage in these transactions through its control of the assets of participants enrolled in the managed-account program, and the compensation paid to parties in interest pursuant to these transactions was unreasonable.

92.     As a direct and proximate result of these prohibited transactions, Class members directly or indirectly paid fees in connection with transactions that were prohibited under ERISA, and received investment returns below the returns they would have received had Stadion not caused the plan to engage in these prohibited transactions, resulting in significant losses to participants' accounts. Stadion is liable to make good to participants all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with its unlawful conduct.  In addition, Class members are entitled to further equitable and injunctive relief on account of these prohibited transactions.

## COUNT IV
### Prohibited Transactions with a Fiduciary
### 29 U.S.C. § 1106(b)

93.     As described throughout this Complaint, Stadion is a fiduciary with respect to the assets that it manages for participants enrolled in Stadion's managed account program through plans administered by United of Omaha.

94.     Acting in its fiduciary capacity as managed-account provider, Stadion allocated participant assets to Stadion-affiliated investment options that provided direct and indirect financial benefits to Stadion. In so doing, Stadion dealt with plan assets in its own interest and for its own account, in violation of 29 U.S.C. § 1106(b)(1), and received consideration for its personal account in connection with transactions involving assets of the plan, in violation of 29 U.S.C. § 1106(b)(3).

95.     As a direct and proximate result of these prohibited transactions, Class members directly or indirectly paid fees in connection with transactions that were prohibited under ERISA, and participants lost investment earnings that they would have obtained had Stadion not invested managed account assets in its own interests. Stadion is liable to make good to participants all losses suffered as a result of Stadion's prohibited transactions, and to disgorge all profits associated with its unlawful conduct. In addition, Class members are entitled to further equitable and injunctive relief on account of these prohibited transactions.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, individually and as a representative of the Class, prays for relief as follows:

a. A determination that this action may proceed as a class action under the Federal Rules of Civil Procedure;

b. Designation of Plaintiff as the Class Representative and designation of Plaintiff's counsel as Class Counsel;

c. A declaration that Stadion has breached its fiduciary duties under ERISA;

32

d.  A declaration that Stadion violated 29 U.S.C. § 1106 by engaging in prohibited transactions;

e.  An order compelling Stadion to make good all losses incurred as a result of the breaches of fiduciary duty and prohibited transactions described above;

f.  An accounting for profits earned by Stadion in connection with the breaches of fiduciary duty and prohibited transactions described above and a subsequent order requiring Stadion to disgorge all such profits received;

g.  An accounting for profits earned by United of Omaha in connection with the breaches of fiduciary duty and prohibited transactions described above and a subsequent order requiring United of Omaha to disgorge all such profits received;

h.  An order enjoining Stadion from any further violations of ERISA;

i.  Other equitable relief to redress the practices described herein and to enforce the provisions of ERISA;

j.  An award of pre-judgment interest;

k.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

l.  An award of such other and further relief as the Court deems just and equitable.

Dated January 25, 2019        /s/ F. Hill Allen

F. Hill Allen
North Carolina State Bar No. 18884
**THARRINGTON SMITH, L.L.P.**
P.O. Box 1151
Raleigh, NC 27602-1151
Telephone: 919-821-4711
Facsimile: 919-829-1583
E-mail: hallen@tharringtonsmith.com

NICHOLS KASTER, PLLP
Kai H. Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
Paul Lukas, MN Bar No. 22084X*
Brandon T. McDonough, MN Bar No. 0393259*
Brock J. Specht, MN Bar. No. 0388343*
* *Notice of Special Appearance* forthcoming
4600 IDS Center, 80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
cengstrom@nka.com
lukas@nka.com
bmcdonough@nka.com
bspecht@nka.com