IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KIMBERLY DAVIS, individually and as<br>The representative of a class of similarly<br>situated persons, | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | 1:19CV119 |
| STADION MONEY MANAGEMENT, LLC<br>and UNITED OF OMAHA LIFE<br>INSURANCE CO., | )<br>)<br>)<br>) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge

This action is brought pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Before the Court are motions to dismiss Plaintiff's First Amended Class Action Complaint filed by Defendants Stadion Money Management, LLC ("Stadion") and United of Omaha Life Insurance Company ("United"), (ECF Nos. 42; 47), as well as United's Motion to Transfer Venue to the District of Nebraska, (ECF No. 32). For the reasons stated below, United's Motion to Transfer will be granted. Accordingly, the Court declines to resolve Defendants' motions to dismiss, which shall be transferred as part of this action to the District of Nebraska.

**I.   BACKGROUND**

*A. ERISA Overview*

"Congress enacted ERISA to promote the 'soundness and stability of [employee benefit plans]' in private industry." *Trs. of the Plumbers and Pipefitters Nat'l Pension Fund v. Pluming Servs., Inc.*, 791 F.3d 436, 440 (4th Cir. 2015) (quoting 29 U.S.C. § 1001(a)) (alteration in the

original).  Specifically, the law (1) establishes certain "minimum standards" of equitability and financial soundness for employee benefits plans and then (2) provides "appropriate remedies, sanctions, and ready access to the Federal courts" to cure any breaches of those standards.  *See id.*; *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).

In 2006, Congress enacted the Pension Protection Act ("PPA") to "increase employee participation in § 401(k) retirement plans."  *Bidwell v. Univ. Med. Ctr., Inc.*, 685 F.3d 613, 616 n.1 (6th Cir. 2012).  Specifically, the PPA amended ERISA "to provide a safe harbor for plan fiduciaries investing participant assets in certain types of default investment alternatives in the absence of participant investment direction."  U.S. Dep't of Labor, Fact Sheet: Default Investment Alternatives Under Participant-Direct Individual Account Plans (Sept. 2006), *available at* https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/default-investment-alternatives-under-participant-directed-individual-account-plans. That is, the PPA encourages employers to automatically invest the savings of employees who do not select a 401(k) plan on their own by limiting employers' legal exposure for these automatic enrollments.[1]  *Id.*; *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 794 (D. Minn. 2018).  In exchange for this safe harbor, so-called QDIA (qualified default investment alternative) plans must comply with Department of Labor regulations.  *See Bidwell*, 685 F.3d at 616.

B. *The Parties*

Plaintiff, Kimberly Davis, lives in Greensboro, North Carolina where she worked for Festival Fun Parks, LLC d/b/a Palace Entertainment.  (*See* ECF Nos. 36 ¶ 13; 28-1 at 2.)

---

[1] Participants automatically enrolled in these qualified default investment alternative plans must be notified and given time to opt-out—provisions of the PPA not at issue here.  (*See* ECF No. 44 at 6.)

2

Palace Entertainment is a California-based company. (*See* ECF No. 28-3 at 2.) Davis was automatically enrolled by her employer in the "Palace Plan," Palace Entertainment's QDIA. (*See* ECF Nos. 36 ¶ 13 (explaining that Plaintiff participated in the Palace Plan); 28-1 at 2 (documenting that the Palace Plan was a QDIA).) The Palace Plan was managed by Stadion. (ECF No. 36 ¶ 13.) Stadion "canceled [Davis's] service" when she "received a distribution of . . . benefits" in March 2013. (*Id.*)

Defendant, Stadion, "is a registered investment adviser based in Watkinsville, Georgia." (*Id.* ¶ 14.) Stadion provides "managed account services to participants in ERISA-covered plans throughout the United States."[2] (*Id.*) "Stadion invests each participant's funds into one of its risk-based portfolios" with younger participants generally placed into riskier plans focused on growth and older participants placed into more conservative plans focused on capital preservation. (ECF Nos. 44 at 6; 36 at ¶¶ 35–36.) In return for its investing services, Stadion receives a fee agreed to by the plan's sponsor. (ECF No. 44 at 7.)

Defendant, United, is an insurance company based in Omaha, Nebraska. (ECF No. 36 ¶ 15.) United "issues group variable annuity contracts to employer-sponsored retirement plans and provides attendant administrative and investment services."[3] (*Id.*)

---

[2] "A 'managed account' is one where the investment service makes investment decisions on behalf of the investor clients, for which it receives a management fee." *Legent Clearing, LLC v. Balistreri*, No. 09 C 3662, 2009 WL 2567947, at *1 (N.D. Ill. Aug. 19, 2009).

[3] "A variable annuity is a contract between an investor and an insurance company pursuant to which the insurance company promises to make periodic payments to the contract owner or beneficiary, staring immediately or at some future time." *Sivolella v. AXA Equitable Life Ins. Co.*, No. 11–4194, 2012 WL 4464040, at *1 (D.N.J. Sept. 25, 2012) (internal quotations omitted). While fixed annuities provide their beneficiaries the security of guaranteed disbursements, variable annuities pay out at varying levels based on the performance of their investments. *See O'Donnell v. AXA Equitable Life Ins. Co.*, 887 F.3d 124, 125–26 (2nd Cir. 2018).

### C. *Stadion's Relationship with United and Alleged ERISA Violations*

According to Plaintiff, Stadion's managed account service has consistently "delivered underwhelming results." (*Id.* ¶ 24.) Given this poor performance, Stadion could only expand by "establish[ing] new marketing relationships with insurance companies," like United, who could "pitch Stadion's managed account service" to the participants in the group variable annuities they managed. (*See id.* ¶ 25.) In exchange for these managed account services, Stadion "receives a managed account fee" which it splits with United. (*See id.* ¶ 26.)

Plaintiff initiated this lawsuit on behalf of all "participants and beneficiaries whose accounts were enrolled in Stadion's managed account service within a retirement plan administered by United of Omaha for any period of time after January 25, 2013." (*Id.* ¶ 74.) At its core, Plaintiff's Complaint alleges that Stadion "select[ed] investment options that generate[d] higher fees for [United]" and, in exchange, United kept referring Stadion to provide managed account services despite Stadion's lackluster track record. (*See id.* ¶¶ 3–5.) In Count One, Plaintiff alleges Stadion violated its fiduciary duties of loyalty and prudence by investing in investment options affiliated with Defendants when "unaffiliated options . . . would have provided better performance at lower costs." (*See id.* ¶¶ 81–84.) In Count Two, Plaintiff alleges United wrongfully and knowingly profited from Stadion's ERISA violations. (*Id.* ¶¶ 85–87.) In Count Three, Plaintiff alleges Stadion engaged in prohibited transactions with a party in interest, United. (*Id.* ¶¶ 88–92.) Finally, in Count Four, Plaintiff alleges Stadion engaged in prohibited transactions with itself. (*Id.* ¶¶ 93–95.)

## II. UNITED'S MOTION TO TRANSFER

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division

where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Such requests for a transfer of venue are "committed to the sound discretion of the district court." *Jenkins v. Albuquerque Lonestar Freightliner, LLC*, 464 F. Supp 2d 491, 493 (E.D.N.C. 2006). When ruling on a motion to transfer, courts should consider:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

*Plant Genetic Sys., N.V. v. Ciba Seeds*, 933 F. Supp. 519, 527 (M.D.N.C. 1996). The "analysis of these factors is qualitative, not merely quantitative." *Speed Trac Techs., Inc. v. Estes Express Lines, Inc.*, 567 F. Supp. 2d 799, 803 (M.D.N.C. 2008) (quoting *Commercial Equip. Co. v. Barclay Furniture Co.*, 738 F. Supp. 974, 976 (W.D.N.C. 1990)). Ultimately, the party seeking transfer "has the burden of persuasion and must show (1) more than a bare balance of convenience in his favor and (2) that a transfer does more than merely shift the inconvenience." *Datasouth Comput. Corp. v. Three Dimensional Techs., Inc.*, 719 F. Supp. 446, 451 (W.D.N.C. 1989) (internal quotations omitted).

Here, transfer is permissible under 28 U.S.C. § 1404(a), which authorizes transfer to another district where the action could have originally been filed. 28 U.S.C. § 1404(a). ERISA's venue provision allows a plaintiff to sue "where the plan is administered, where the

5

breach took place, or where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2). An alleged breach "is considered to have occurred in the district where the beneficiary receive[d] [her] benefits." *Schrader v. Trucking Emps. of N.J. Welfare Fund, Inc.-Pension Fund*, 232 F. Supp. 2d 560, 573 (M.D.N.C. 2002). In this case, Plaintiff could have sued either in this District or the District of Nebraska as Plaintiff appears to have received her benefits in Greensboro and United resides in Omaha, Nebraska. (*See* ECF No. 36 ¶¶ 13, 15.) Having concluded that transfer is permissible, the Court now turns to the relevant discretionary factors to determine if transfer is warranted.

*A. The Plaintiff's Initial Choice of Forum*

"The plaintiff's choice of forum generally is entitled to respect and deference and should rarely be disturbed." *Speed Trac*, 567 F. Supp. 2d at 803 (internal citations and quotations omitted). This usual deference is heightened both when the plaintiff sues in her home state, *see Campbell v. Apex Imaging Servs., Inc.*, Nos. 1:12CV1366, 1:12CV1365, 2013 WL 4039390, at *4 (M.D.N.C. Aug. 7, 2013), and when the case is once involving ERISA, *Trus. of the Plumbers*, 791 F.3d at 444 (explaining that an ERISA plaintiff's choice of forum deserves greater than usual weight in a transfer of venue analysis because Congress intended such plaintiffs to have substantial flexibility regarding where they sued). However, this usual deference is diminished when the plaintiff is the representative in a class action. *See Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 627, 633 (E.D. Va. 2006) ("Courts often give less weight to the plaintiff's choice of forum in class actions."); 1 *McLaughlin on Class Actions* § 2:46 (16th ed. 2019) ("[I]f the members of the proposed class reside in numerous states, the traditional deference accorded plaintiff's forum selection ordinarily is greatly diminished."). It is further diminished when the plaintiff's choice of forum has little connection to the action. *See Parham*

*v. Weave Corp.*, 323 F. Supp. 2d 670, 674 (M.D.N.C. 2004) ("The deference given to the plaintiff's choice is proportionate to the relation between the forum and the cause of action.").

Here, Plaintiff is suing under ERISA in her home state of North Carolina. (*See* ECF No. 37 at 12–13.) While courts should be hesitant to disrupt such a plaintiff's choice of forum, Plaintiff's decision to sue in this District should be afforded less than the usual deference for two reasons. First, Plaintiff is the representative of a broad class that is not intimately tied to any state and that is, in fact, more closely connected with Nebraska than North Carolina. Once again, Plaintiff defines her putative class as "[a]ll participants and beneficiaries whose accounts were enrolled in Stadion's managed account service within a retirement plan administered by United of Omaha for any period of time after January 25, 2013." (ECF No. 36 ¶ 74.) United estimates that as of February 13, 2019, 15,219 individuals belonged to this class by virtue of their participation in one of the 720 United-administered retirement plans utilizing Stadion's managed account service. (ECF No. 34 ¶ 10.) These individuals reside in forty-one states and the District of Columbia. (*Id.* ¶ 11.) Sixty-one of the 720 retirement plans were administered by employers located in Nebraska while only seventeen were administered by employers located in North Carolina. (*Id.*) Furthermore, 1,591 prospective class members worked for Nebraska-based employers while just 273 worked for North Carolina-based employers. (*Id.*) Thus, this putative class contains individuals from across the United States and appears to have a closer connection to Nebraska than North Carolina. As discussed above, this greatly diminishes the deference normally afforded the plaintiff's choice of forum. Second, Plaintiff's choice of forum is owed less than the usual deference because of the limited connection between North Carolina and her cause of action. *See Parham*, 323 F. Supp. 2d at 674. Plaintiff lives and worked in Greensboro, (ECF No. 36 ¶ 13), and claims that Stadion advertised to her

7

in the state (ECF No. 37 at 21), but these are North Carolina's most substantial connections to this matter.[4] The other main players in this litigation reside elsewhere—Defendants Stadion and United are citizens of Georgia and Nebraska respectively, (*see* ECF No. 33 at 6–7), and Plaintiff's former employer, Palace Entertainment—a potentially relevant non-party to the suit—is a California company, (ECF No. 35-1 at 2). Moreover, Plaintiff's Complaint focuses on the alleged self-dealing between Stadion and United, none of which is alleged to have occurred in North Carolina. (*See* ECF No. 36.) Given this relatively tenuous connection between North Carolina and Plaintiff's ERISA claims, Plaintiff's choice of forum is not owed great respect. In sum, the first discretionary factor—the plaintiff's initial choice of forum—is accorded substantially less weight here as Plaintiff chose to litigate an ERISA case in her home state while serving as the head of a putative, diffuse class in an action that has little to do with North Carolina.

B. *Relative Ease of Access to Sources of Proof*

The second factor, relative ease of access to sources of proof, cuts in favor of transfer. "In weighing this factor, courts consider the relative ease of access to witnesses and other evidence for trial." *Speed Trac*, 567 F. Supp. 2d at 804. Here, there are two likely sources of proof: documents and witnesses, both of which are concentrated in Nebraska.[5] (ECF No. 34 ¶¶ 6–8.) While the Court agrees with Plaintiff that the physical location of documents should

---

[4] Any advertisement Stadion may have directed at Plaintiff is of little relevance to the case as Stadion offered its services to Palace Entertainment as a QDIA, meaning Plaintiff played no role in selecting it to invest her retirement savings. (*See* ECF No. 28-1 at 2.)

[5] Some documents and witnesses also appear to be located with Stadion in Georgia. (ECF No. 33 at 17.) Stadion, however, supports United's effort to transfer this matter to Nebraska, apparently agreeing that Nebraska is the best forum for this dispute. (*See* ECF No. 32 at 1; 33 at 17.)

be of little importance in our age of digitized documents, (*see* ECF No. 37 at 15), the fact remains that Omaha "is the epicenter of United's retirement service business and the location where all of the executive and management activities, decision-making, and strategy takes place." (ECF No. 34 ¶ 6.) Thus, it is likely that most of the critical witnesses are located there. North Carolina, by contrast, is home only to Davis, who would likely suffer less personal inconvenience from transferring this case, particularly as United has offered to depose her in North Carolina.[6] (ECF No. 46 at 13 n.7.) Therefore, "it appears that [Nebraska] would be far more convenient for the great majority of the witnesses in the case"—a factor that weighs heavily in favor of transfer. *See Lab. Corp. of Am. Holdings v. Schumann*, 474 F. Supp. 2d 758, 768 (M.D.N.C. 2006).

C. *Cost of Obtaining Attendance of Willing and Unwilling Witnesses*

Here, there is no indication that any witness will be unwilling to participate in this litigation. Thus, the Court's analysis of the third discretionary factor—the cost of obtaining attendance of willing and unwilling witnesses—folds into the analysis related to ease of access to proof, further bolstering Defendant's case for transfer.

D. *Administrative Difficulties of Court Congestion*

Next, courts look to statistics examining how long it generally takes a case to advance from complaint to disposition. *See, e.g., Triad Int'l Maint. Corp. v. Aim Aviation, Inc.*, 473 F. Supp. 2d 666, 671 (M.D.N.C. 2006); *Lab. Corp.*, 474 F. Supp. 2d at 767–68. The quicker the district, the more appropriate the transfer of venue, as all parties benefit from a speedy resolution of

---

[6] To the extent that Plaintiff's counsel intends to call other putative class members as witnesses, this would weigh even more heavily in favor of transfer because, as discussed above, it appears that considerably more potential class members reside in Nebraska than in North Carolina. (*See* ECF No. 34 ¶ 11.)

9

disputes.  *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984).  These statistics are, of course, of greater importance when they reveal "dramatic" discrepancies in average case time than when they reveal only minor differences.  *See Triad Int'l*, 473 F. Supp. 2d at 671.

Here, Defendant offers statistics indicating that in 2018, the median civil case advanced from filing to disposition in 10.4 months in this District and in 7.4 months in Nebraska.  (ECF No. 35-3 at 2–3.)  This is consistent with data going back to 2013 indicating that Nebraska handles cases slightly faster than the Middle District does.  (*See id.*)  The Court does not find this three-month difference to be so sizable as to weigh more than slightly in favor of transfer. *See Triad Int'l*, 473 F. Supp. 2d at 671 (finding that a 3.6-month difference in median wait time was "marginal" and so did "not weigh strongly in favor of transfer").

E. *Local Interest in Having Localized Controversies Settled at Home*

The ninth factor—the local interest in having localized controversies settled at home—reflects the judgment of the federal courts that "litigation should take place in the federal judicial district or division with the closest relationship to the operative events."  *Speed Trac*, 567 F. Supp. 2d at 804.  Here, Nebraska has a closer relationship with the operative events because—while both states are home to a party and to putative class members—only Nebraska has a substantial connection with the heart of the matter: whether Defendants engaged in impermissible self-dealing.  (*See* ECF No. 36 ¶ 3 ("This case focuses on Stadion's relationship with [United], and the self-interested conduct of both parties in relation to Class members' retirement assets.")  Thus, this factor weighs in favor of transfer.

F. *Remaining Factors and Summary*

The remaining factors are not germane to this inquiry.  No view of a premises is necessary; neither party alleges there will be difficulty obtaining a judgment or a fair trial; and

10

this is not a diversity case implicating questions of state law or conflicts of law. *See Plant Genetic Sys.*, 933 F. Supp. at 527. In reviewing the relevant factors, the Court finds that transfer is appropriate despite Plaintiff's decision to bring suit in North Carolina since (1) the deference owed to Plaintiff's initial choice is diminished in a class action with a limited connection to North Carolina; (2) sources of proof (primarily in the form of witnesses) will be easier to access in Nebraska; (3) Nebraska's trial docket is slightly less congested than this District's; and (4) Nebraska has a stronger interest in resolving this dispute because its connection to the case is clear while North Carolina's is relatively tenuous. Thus, United has carried its burden of persuading the Court that "more than a bare balance of convenience" is in its favor and that a transfer would further the interests of justice by doing more than "merely shift[ing] the inconvenience" from Defendant to Plaintiff. *See Datasouth*, 719 F. Supp. at 451. Accordingly, Defendant's motion to transfer will be granted.

## III. CONCLUSION

The Court concludes that it would further the interests of justice and the convenience of the parties and potential witnesses to transfer this matter to the District of Nebraska.

For the reasons outlined herein, the Court enters the following:

**[ORDER TO FOLLOW ON NEXT PAGE]**

# ORDER

IT IS THERFORE ORDERED that Defendant's Motion to Transfer Venue, (ECF No. 32), is GRANTED, and the Clerk of Court shall transfer this action to the United States District Court for the District of Nebraska. The Court declines to resolve Defendants' motions to dismiss, (ECF Nos. 42; 47), which shall be transferred, as part of this action, to the District of Nebraska.

This, the 20th day of December 2019.

/s/ Loretta C. Biggs
United States District Judge